**FEDERAL ELECTION COMMISSION, Plaintiff-Appellant,**

**v.**

**SAILORS' UNION OF the PACIFIC POLITICAL FUND; Paul Dempster, Treasurer; Marine Firemen's Union Political Action Fund; Joel E. McCrum, Treasurer; Seafarers' Political Activity Donation; John Fay, Treasurer; Thomas J. Bovo, Assistant Treasurer, Defendants-Appellees.**

**No. 86–1775.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 9, 1987.

Decided Sept. 15, 1987.

\*   \*   \*   \*   \*   \*

---

Jonathan A. Bernstein, Washington, D.C., for plaintiff-appellant.

James Altman, New York City, for defendants-appellees.

Before CANBY, NORRIS and KOZINSKI, Circuit Judges.

NORRIS, Circuit Judge:

This case presents the question whether three affiliate unions of Seafarers International Union of North America (Seafarers) should be considered "local units" of Seafarers or independent "labor organizations" affiliated with Seafarers for the purpose of calculating compliance with the campaign contributions limitation of the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. §§ 431 *et seq.* (the Act). We hold that at least two of the three unions are independent labor organizations under the Act and that therefore the respective related political action committees

(PACs) of all three must be treated separately to determine the PACs' compliance with the campaign contribution limitation in 2 U.S.C. § 441a(a)(2).

## I

### A

In its original form, the Federal Election Campaign Act of 1971 consisted mainly of comprehensive financial contribution and expenditure reporting requirements for federal election campaigns and limitations on expenditures from personal funds by candidates for federal office. Pub.L. No. 92–225, 86 Stat. 3, 11 (1972). Concerned with the related problems of the influence of wealth on federal elections and the potential for abuse created by a system of uninhibited political giving, Congress revised the Act in 1974 to curtail perceived abuses in the system. Federal Election Campaign Act Amendments of 1974 (1974 Amendments), Pub.L. No. 93–443, 88 Stat. 1263, 1272. The 1974 Amendments established for the first time substantive contribution caps, enforced by criminal penalties, that strictly limited the amount that any group or individual could contribute to a campaign for federal office. *Id.* at § 101. Moreover, the amendments created the Federal Election Commission, an oversight agency to police compliance with the Act's substantive and procedural requirements.

The Commission's enforcement of the new contribution limitations soon proved inadequate to the task of controlling the amounts contributed to federal campaigns by resourceful unions and corporations. Faced with limitations on the amounts their PACs could contribute to a given campaign, large unions and corporations began creating hundreds of new PACs through their locals and subsidiaries. *See* 122 Cong.Rec. 6710–23 (1976) (excerpt of presentation by Common Cause). In 1976, Congress responded. *See* Federal Election Campaign Act Amendments of 1976 (1976

Amendments), Pub.L. No. 94–283, 90 Stat. 475. Although its main concern at that time was making the necessary amendments in response to Supreme Court's recent decision in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976),[1] Congress also enacted "[p]rovisions to curtail vertical proliferation of contributions by political committees." 122 Cong.Rec. 12182 (1976) (summary of key provisions of the amendments by Senator Cannon).

First, leaving the monetary caps on individual and organizational contributions to federal campaigns virtually unchanged,[2] the 1976 Amendments provided far more detailed regulation of group contributions, especially from corporations and labor organizations. Under the 1976 Amendments, a labor organization may no longer contribute directly to federal campaigns but must instead create "a separate segregated fund to be utilized for political purposes." 2 U.S.C. § 441b(b)(2). These funds are popularly known as political action committees or PACs, and the labor organizations responsible for the establishment, finance, maintenance and control of particular PACs are denominated the PACs' "connected organizations." 2 U.S.C. § 431(7).

Moreover, in order to prevent unions and corporations from using their locals and subsidiaries to establish large numbers of separate segregated funds, Congress added specific so-called "anti-proliferation rules" which provide:

> For purposes of the limitations [on campaign contributions] provided by paragraph (1) and paragraph (2), all contributions made by political committees established or financed or maintained or controlled by any corporation, labor organization, or any other person, including any parent, subsidiary, branch, division, department, or local unit of such corporation, labor organization, or any other person, or by any group of such persons, shall be considered to have been made by a single political committee.... In any

---

1. *Buckley* invalidated significant portions of the Act but allowed the Commission 30 days before much of the judgment took effect. 424 U.S. at 144, 96 S.Ct. at 694.

2. Multicandidate political committees still may not contribute more than $5,000 in the aggregate to any candidate or her authorized political committee. 2 U.S.C. § 441a(a)(2)(A).

case in which a corporation and any of its subsidiaries, branches, divisions, departments, or local units, or a labor organization and any of its subsidiaries, branches, divisions, departments, or local units establish or finance or maintain or control more than one separate segregated fund, all such separate segregated funds shall be treated as a single separate segregated fund for purposes of the limitations provided by paragraph (1) and paragraph (2).

2 U.S.C. § 441a(a)(5). As the House Conference Report notes, "The anti-proliferation rules established by the conference substitute are intended to prevent corporations, labor organizations, or other persons or groups of persons from evading the contribution limits...." H.R.Conf.Rep. No. 1057, 94th Cong., 2d Sess. 58, *reprinted in* 1976 U.S.Code Cong. & Admin.News 929, 946, 973. Thus, when subdivisions of large unions each create segregated funds for making campaign contributions, section 441a(a)(5) requires the contributions of those funds to be aggregated for the purpose of calculating the funds' compliance with campaign contribution limitations. Through this mechanism, Congress hoped to prevent unions from evading contribution limitations through a Hydra-like proliferation of segregated funds, each making separate contributions, but each being a part of the same beast.[3]

## B

Seafarers, nominally an "international union," is concededly a labor organization covered by section 441a(a)(5). Its organizational structure is divided into various units, including what its constitution terms "autonomous affiliated organizations." Constitution of the Seafarers International Union of North America, AFL-CIO (Seafarers Constitution), Excerpts of Record (E.R.) at 124–27. Three of those affiliated organizations—Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District (SIUAG), Marine Firemen's Union (MFU), and Sailors' Union of the Pacific (SUP) (collectively "the affiliates")—are involved in this action. Each of them has established and maintained a multicandidate PAC—respectively, Seafarers' Political Activity Donation (SPAD), Marine Firemen's Union Political Action Fund (Firemen's Fund), and Sailors' Union of the Pacific Political Fund (Sailors' Fund) (collectively, "the PACs")—through which the affiliates make contributions to the political campaigns of individual candidates.

Between May 1981 and March 1982, the PACs contributed in the aggregate more than $5,000 to the senatorial campaign of former California Governor Jerry Brown. Individually, however, none of the affiliates exceeded this amount. Upon a citizen complaint that the combined contributions of the three PACs violated the limits of section 441a(a)(2), the Commission investigated the contributions and then brought this action in the Northern District of California for declaratory and injunctive relief and civil penalties against the three PACs. The Commission claimed that the affiliates, as the connected organizations of the PACs, must be considered local units of Seafarers, and therefore the campaign contributions of the three PACs must be aggregated for the purpose of determining compliance with section 441a(a)(2).

On cross-motions for summary judgment, the district court rejected the Commission's argument that the affiliates are "local units" of Seafarers under the statute and granted summary judgment in favor of the PACs. 624 F.Supp. 492 (N.D.Cal.1986). The Commission appeals. We affirm.

## II

■ We review a summary judgment de novo. *Siles v. ILGWU National Retirement Fund*, 783 F.2d 923, 926 (9th Cir. 1986). "[P]ure questions of statutory construction [are] for the courts to decide." *INS v. Cardoza-Fonseca*, —— U.S. ——,

---

**3.** As one Congressman noted, the amendments would "place[ ] some rational organizational framework on the proliferation of PAC's by both business and labor, thus avoiding the anonymity of multi-PAC's, and lessening the chances for Watergate-type laundering and other abuses." 122 Cong.Rec. 8881 (1976) (comments of Rep. Thompson).

107 S.Ct. 1207–22, 94 L.Ed.2d 434 (1987). When an agency construes a statute by applying the statutory standard to particular sets of facts through a process of case-by-case adjudication, its interpretation is entitled to deference. *Id.* at 1221–22. Here, however, the Commission has engaged in no such adjudication, nor has Congress authorized it to do so. It has merely determined that "probable cause" exists to bring this action. *See* 2 U.S.C. § 437g(a)(4)(A)(i), (5)(C). The Commission's views, while entitled to deference, *FEC v. Democratic Senatorial Campaign Committee*, are not entitled to prevail if contrary to the congressional intent of the statute. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984).

### III

### A

■ On the merits, we must determine whether SIUAG, MFU, and SUP are "subsidiaries, branches, divisions, departments, or local units" of Seafarers. The Commission presses the argument that section 441a(a)(5) creates an "automatic" or "per se" rule "requiring that the political committees of all subdivisions of an international union be subject to a single contribution limit regardless of the degree of internal control exercised by the international union" and "regardless of the internal organizational structure of any particular international." Brief for the Federal Election Commission at 16; Reply Brief for the Federal Election Commission at 2. The PACs counter that in the absence of any reference to "the actual relationship among particular entities," the Commission's attempt to apply a per se rule must rely on empty names and labels. Appellees' Brief at 30–32.

We agree with the PACs that section 441a(a)(5)'s aggregation requirement can apply only upon a substantive determination that SIUAG, MFU, and SUP are "subsidiaries, branches, divisions, departments, or local units" of Seafarers. Furthermore, we also agree with the PACs that that

determination can be made only by examining the organizational division of power between the union in question and the larger organization. The Commission contends at some points that we need not examine the degree of Seafarers' organizational authority over its affiliates to apply a "formal relations test," *see, e.g.*, Reply Brief for the Federal Election Commission at 5–9, but this position collapses into an argument that the mere label "international union" is sufficient to trigger section 441a(a)(5).

Moreover, the Commission's own arguments make clear that authority is the central question under section 441a(a)(5). The Commission admits that section 441a(a)(5) does not force aggregation with respect to the members of federations of independent labor organizations like the AFL–CIO, yet the PACs have argued that Seafarers is just such a federation because of the rather limited nature of Seafarers' centralized authority. Even the Commission has asserted, "[T]he question properly presented by this case is whether the Seafarers International Union is an international union of which Seafarers Atlantic and the Pacific District unions are component parts, rather than a federation of independent labor organizations like the AFL–CIO." Brief for the FEC at 16. We cannot answer this question without determining where the power lies in the Seafarers organizational structure.

The Commission's reliance on the term "international union" is not completely unavailing, however. Although the foregoing analysis demonstrates that we must look to the relationships of control in the organizational structure, the statutory language gives us little help in determining how much control must be present before an individual labor union will be considered the subsidiary, branch, division, department, or local unit of a larger organization. We find help in the legislative history, however, which draws a dichotomy between international unions and labor federations.

Various comments in the records of both the House and Senate suggest that through the operations of section 441a(a)(5) Congress intended to aggregate campaign

contributions of locals of international unions but did not intend to aggregate contributions of member unions of labor federations.[4] Indeed, the typical international union/local union relationship probably exemplifies the type of relationship Congress was attempting to regulate through section 441a(a)(5). For example, the Conference Committee which reported out the Act specifically noted, "All of the political committees set up by a single international union and its local unions are treated as a single political committee." H.R.Conf.Rep. No. 1057, 94th Cong., 2d Sess. 58 (1976), *reprinted in,* 1976 U.S.Code Cong. & Admin. News 946, 973. *See also* H.R.Rep. No. 917, 94th Cong., 2d Sess. 6 (1976). The legislative history also indicates, however, that Congress did not intend the statute to aggregate the contributions of individual unions because of their mere membership in an umbrella organization like the AFL-CIO. As Representative Wayne Hayes, the chairman of the committee that considered the bill, noted, "I think it is clear in the language that international unions may be members of the AFL-CIO, but that does not say that international unions and the AFL-CIO are to be treated as one. Just as corporations may have a PAC and also be a member of the Chamber of Commerce, or its subsidiaries, any international union in the States are [sic] also treated as a corporation with its subsidiaries, the AFL-CIO is a separate one and the National Chamber of Commerce is a separate one." 122 Cong.Rec. 8573 (1976). As noted above, the Commission does not dispute this proposition.

Indeed, the Commission's own regulations reflect this understanding of the types of organizations Congress wanted to prevent from evading the campaign contribution limitations. First, the regulations note that section 441a(a)(5) was meant to apply to "[a]ll political committees set up by a single national or international union and/or its local unions or other subordinate organizations of the national or international union." 11 C.F.R. § 100.5(g)(2)(i)(B) (1986). The use of the qualification "subordinate" here reemphasizes that the typical international/local relationship is thought to exemplify a relationship of organizational subordination of the lesser entity. Second, the regulations do not cover campaign contributions by independent members of a labor federation. Section 100.5(g)(2)(i)(C) purports to cover only subordinate divisions of AFL-CIO type federations, not the member unions themselves. *See* 11 C.F.R. § 100.5(g)(2)(i)(C) (1986). Thus, Seafarers and its affiliates do not fall within this section of the regulation.

## B

■ We now consider whether the organic structure of Seafarers is closer to that of an international union or that of a federation of unions. Moving to section (ii) of the Commission's regulations, 11 C.F.R. § 100.5(g)(2)(ii), we look to the constitutions of Seafarers and its affiliates to determine the degree of control which Seafarers may exercise over its affiliates. *See* 11 C.F.R. § 100.5(g)(2)(ii) (1986).[5] We conclude that at least MFU and SUP are independent labor organizations for the purposes of sec-

---

**4.** For the sake of clarity, we note that we are not faced here with the contention made in *Walther v. Federal Election Commission,* 468 F.Supp. 1235 (D.D.C.1979), that political committees of the AFL-CIO and its member unions are completely exempt from section 441a(a)(5).

**5.** Section 100.5(g)(2)(ii) provides:
> For organizations not covered by paragraph (g)(2)(i) of this section, indicia of establishing, financing, maintaining, or controlling include:
> (A) Ownership of a controlling interest in voting shares or securities;
> (B) Provisions of bylaws, constitutions, or other documents by which one entity has the

authority, power, or ability to direct another entity;
> (C) The authority, power, or ability to hire, appoint, discipline, discharge, demote, or remove or otherwise influence the decision of the officers or members of an entity;
> (D) Similar patterns of contributions;
> (E) The transfer of funds between committees which represent a substantial portion of the funds of either the transferor or transferee committee, other than the transfer of funds between the committees which jointly raised the funds so transferred.

11 C.F.R. § 100.5(g)(2)(ii) (1986).

tion 441a(a)(5) and that accordingly campaign contributions by all the Funds may not be aggregated.

To say the least, Seafarers is organizationally distinctive. According to its constitution, its members are individual workers—"bona fide seamen, fishermen, fish cannery workers, workers in allied maritime trades, industrial trades, and all other trades on all waters and lands adjacent thereto ... including all workers in all trades, occupations or industries represented by affiliates of this International Union...." Art. I, § 2. The portion of the constitution dealing with "Form of Organization" describes the "two units of organization" as "A. Local unions, including all unions without divisions or branches" and "B. District organizations, including all unions with either divisions or branches or both." Art. IV, § 1. On the other hand, the Preamble of the Seafarers Constitution also makes clear that the units which compose the organization and provide its membership are to be "autonomous affiliated organizations." Indeed, two of the affiliates in this case, MFU and SUP, actually predate the international. Although the Seafarers Constitution fails to define how these "autonomous affiliated organizations" fit into the "local union"/"district organization" structure, the "Form of Organization" specifically provides that the affiliates may disassociate with Seafarers virtually at will. Art. IV, § 3.

Faced with this atypical arrangement, the Commission cites various additional provisions of the Seafarers Constitution for the proposition that Seafarers is a true "international union" which exercises a large degree of authority over its members and affiliates: (1) Article II, section 1 makes the Seafarers Constitution binding upon all members and upon any local district or other subdivision into which members may be formed; (2) Article IX, section 1 allows Seafarers to regulate the amount of dues collected by the affiliates and requires the affiliates to pay a per capita tax out of those dues to Seafarers; (3) Article VIII, section 1A permits Seafarers to conduct grievance procedures involving members; (4) Article V grants an array of powers to the president of Seafarers, including the power to attend all affiliate meetings (section 3A) and to "act on behalf of affiliated unions in connection with governmental problems, legislation or any other matters which are of importance to the interests of [the] International or any of its affiliates" (Section 4); and, (5) Article IX empowers Seafarers to require financial audits of its affiliates and to appoint a custodian to take possession of an affiliate's assets when its dues are in arrears (Section 9).

Several of these provisions are rather unremarkable and vary little from provisions of the Constitution of the AFL–CIO, whose affiliated unions the Commission admits generally are not treated as part of a unitary entity under section 441a(a)(5). For example, like Seafarers affiliates, AFL–CIO affiliates must conform to the AFL–CIO Constitution. Constitution of the American Federation of Labor and Congress of Industrial Organizations, as amended by the Fourteenth Constitutional Convention of the AFL–CIO (1981), Art. I. (E.R. at 128). AFL–CIO affiliates also pay a per capita tax to the federation, Art. XV, and are subject to the arbitral authority of AFL–CIO umpires. Art. XX. Moreover, like the Seafarers President, the AFL–CIO Executive Council has "the power to direct the affairs of the Federation and to take such actions and render such decisions as are necessary and appropriate to safeguard and promote the best interests of the Federation and its affiliated unions ... by means most appropriate for that purpose." Art. VIII, § 2.

Seafarers does have some powers, however, that go beyond those of the AFL–CIO. The authority to regulate dues collected from individual members, audit the affiliates, and to appoint a financial custodian all exceed the level of control exercised by the AFL–CIO. Nonetheless, we do not find these departures significant. The authority to "regulate" dues is limited to *raising* the dues to be collected, and may only be done at a regular or special convention. Auditing certainly is intrusive, but it does not indicate a significant level

of control by Seafarers over its affiliates. Of greater concern, however, is the ability of Seafarers to appoint a financial custodian for an affiliate when the affiliate fails to file its financial reports and/or pay its per capita tax for a period of six months or more. Despite Seafarers contention that any creditor of a union has access to state receivership laws, it is obvious to us that Article IX goes well beyond the remedies traditionally available to creditors under state law.

Nonetheless, this type of intrusion into the affairs of Seafarers affiliates pales by comparison to the highly intrusive authority exercised by traditional international unions over their locals. For example, the Constitution of the International Union, United Steelworkers of America (1982), provides that: (1) the constitution of the international serves as constitution of the locals (Art. I); (2) "No Local Union shall be dissolved, except with the approval of the International Executive Board" (Art. VII, § 3); (3) the locals must create certain committees (Art. VII, §§ 11, 12); (4) "All initiation fees and dues shall be deposited in a separate bank account to be designated as a trust fund for the International Union" (Art. VII, § 5); (5) the International Executive Board may suspend or revoke the charter of any local (Art. IX); (6) "No strike shall be called without the approval of the International President" (Art. XVI); and, (7) "The International Union shall be the contracting party in all collective bargaining agreements and all such agreements shall be signed by the International Officers." (Art. XVII, § 1).

Clearly the level of authority exercised over locals by traditional international unions like the Steelworkers far exceeds the level of control that Seafarers may exercise under its constitution. International unions generally exercise a pervasive influence over the affairs of their locals, yet at its most intrusive level, the Seafarers Constitution merely permits Seafarers to appoint a receiver for an affiliate in order to enforce the local's dues obligation. The Steelworkers does not even need such a provision since the locals' dues go directly into the international's trust account. Moreover, the overall comparison of the Seafarers Constitution to the constitutions of the AFL–CIO and the Steelworkers, reveals a much closer relationship of Seafarers' authority to the limited power of the AFL–CIO than to the broad and intrusive control of the Steelworkers.

We must, however, introduce a special caveat with respect to the relationship between Seafarers and SIUAG. Although the broad outlines of the Seafarers Constitution would not seem to warrant treating SIUAG differently, the facts before us raise some doubt as to whether SIUAG is indeed an independent affiliate. Specifically, the current president of Seafarers is also the current president of SIUAG. E.R. at 33. Clearly joint management in fact is relevant to our inquiry into whether an affiliate is really a subordinate of Seafarers. We need not decide this question with respect to SIUAG, however, because we conclude that both MFU and SUP are independent unions. Since MFU and SUP are independent, none of the PACs are subject to common control and the contributions at issue may not be aggregated.

Thus, we conclude that Seafarers does not have sufficient authority over MFU and SUP to warrant considering them mere "subsidiaries, branches, divisions, departments or local units" of Seafarers. There is no indication in the structure of the Seafarers organization that any of the entities concerned here may control the campaign contributions of more than one PAC, which is the evil section 441a(a)(5) was designed to combat. Therefore, we *AFFIRM* the judgment of the district court.[6]

**6.** Because we dispose of this case on statutory grounds, we do not reach the appellees' First Amendment claims.